J-S16012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYLE REED | : | |
| | : | |
| Appellant | : | No. 843 EDA 2023 |

Appeal from the PCRA Order Entered March 9, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0015615-2010

BEFORE: STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                    **FILED DECEMBER 17, 2024**

Appellant, Kyle Reed, who is serving a life sentence for second-degree murder and other felonies, appeals from an order dismissing his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Appellant contends that he is entitled to relief based upon newly discovered evidence that the chief police investigator in this case, Detective James Pitts, coerced a witness into providing a false statement that played a crucial role in securing Appellant's convictions. We affirm.

Appellant was charged with murdering Ernest Miller during a robbery at Miller's residence. Miller was a retired police officer who operated a photography studio out of his North Philadelphia home. In the early-to-mid 2000s, Appellant paid Miller hundreds of dollars to take photos of his then-girlfriend and mother of his child, Raffinee Taylor, as part of a program for

_____

[*] Former Justice specially assigned to the Superior Court.

aspiring models. Taylor was not offered any modeling opportunities based on Miller's program, and neither she nor Appellant saw him for the next few years. In late 2008, Taylor went to an audition that turned out to be at Miller's house. When she told Appellant about the encounter, he expressed displeasure that Miller was "still doing the same thing" even after "nothing came out of the modeling." N.T. Trial, 11/26/12, at 228.

On December 28, 2008, a few weeks after the audition, Appellant and two friends, Michael Grant and codefendant Vincent Wallace, went to Miller's home, intending to retrieve the money Appellant had paid him previously for Taylor's unsuccessful modeling program. Grant, Miller and Wallace were shot during the robbery.

At the time of the incident, Miller's neighbor, Duane Tate, was driving home and could not access his block. As he tried to make a U-turn, Tate was almost hit by a dark Honda with "the hood smashed on the driver's side." N.T. Trial, 11/28/12, at 178. When Tate went around the block to try another route, he was blocked by the same car. He saw a tall, bald man he identified as codefendant Wallace limping from the direction of Miller's house and getting into the passenger side of the Honda, which then sped off. Tate identified the driver as Appellant.

A short time later, Wallace checked into the hospital with a gunshot wound to the pelvis. When police interviewed him the following day, he claimed that he had been robbed and did not know how he got to the hospital.

Surveillance footage from the hospital, however, showed him being dropped off in the dark Honda that had distinctive damage to the hood.

Police arrived at Miller's house and found Grant lying in front of the house with a gunshot wound to the chest. Grant was later pronounced dead. Near his body, police found a pair of handcuffs, a walkie-talkie, and a dark sweatshirt with Grant's DNA. An officer entered Miller's house and found him face down in a pool of blood. Miller was later pronounced dead.

Ballistics evidence confirmed that two guns were used during the murder. A Golden Saber bullet fired from a .38-caliber revolver was recovered from Miller's body, and several .38-caliber Golden Saber bullet fragments were found in a pattern that suggested they had been fired at a moving target. The bullet recovered from Grant's body was fired from a 9-millimeter Glock handgun, and several fired 9-millimeter cartridges were recovered from the scene. Miller owned a 9-millimeter Glock service revolver. Neither his gun nor the .38-caliber revolver was ever recovered.

On the day of the murder, Grant told his wife, Michelle Hinds, that he was going to "make a run" with Appellant. N.T. Trial, 11/26/12, at 115. When Hinds could not reach her husband later that day, she started calling his friends and eventually reached Appellant. Appellant told her that he could not discuss the situation over the phone but agreed to meet her in person. At the designated location, Appellant climbed into Hinds's car and told her that Grant "didn't make it back from this one." *Id.* at 121. Appellant explained that "it was a shootout and [Grant] got shot." *Id.* He said that he tried to drag Grant

- 3 -

down some stairs "but he was too heavy and he wasn't responding." *Id.* Appellant told Hines that another friend was also shot, and that he took the other friend to the hospital. He also told her, "if it makes you feel any better[,] the person who shot [Grant] is dead. [Grant] is dead." *Id.* at 123.

Appellant disappeared after the shooting. Despite numerous efforts to locate him, he remained a fugitive for several months after police obtained an arrest warrant. Police eventually received a tip that Appellant was living in an apartment in a part of the city far from his usual address. When police went to that address, Appellant tried to jump out a window to escape apprehension but was soon arrested. Police also recovered a bulletproof vest and a key that fit the handcuffs found at the murder scene. N.T. Trial, 11/28/12, at 70–78, 82–83, 86.

Taylor, Appellant's former girlfriend, gave three separate police statements. In her first statement, given on December 29, 2008, she told Detectives Cummings and Glenn that she had seen Appellant on the night of the shooting when he stopped by with medicine for their baby and "said that he didn't feel good." N.T. Trial, 11/26/12, at 211. Taylor also told the detectives that Appellant was driving a black Honda that was "messed up in the front," and confirmed that he was friends with coconspirators Grant and Wallace. *Id.* at 183-84.

Taylor gave her second statement later that afternoon to Detectives James Pitts and Ohmarr Jenkins. She said that Appellant was very upset on the night of the murder because Grant had been shot. Taylor told him she did

not want to hear anything else about the incident, but she drove Appellant to Grant's house at his request. She also said she had seen Appellant with a gun before.

Taylor's third statement was given on January 2, 2009, to Detectives Pitts and Glenn. She told them that about four years ago, she participated in a modeling program with Miller for which Appellant paid $400 or $500, but she never received any modeling offers from it. A few weeks before the shooting, Taylor went to an audition that turned out to be at Miller's studio. When she told Appellant about it afterwards, he was angry and said, "He's at that again[,] huh . . . He owes me money . . . . I'm gonna go down there and see him." *Id.* at 195. Taylor understood this to mean that Appellant would rob Miller if Miller did not give him the money.

At Appellant's preliminary hearing, Taylor claimed that the detectives had made up some of the content of her statements. She confirmed, however, that she was in a modeling program with Miller a few years before his death that never led to any commercials or modeling jobs. Appellant had paid for her to be in the program, and he was surprised to hear that Miller was "still doing the same thing" years later.

Although Taylor initially claimed not to know how much money Appellant paid to Miller, she later agreed that he paid $400 or $500. She also confirmed that Appellant drove a dark-colored Honda with a damaged hood. N.T. Preliminary Hearing, 2/3/10, at 14–32, 48.

- 5 -

At trial, Taylor partially recanted her second and third statements, testifying that she had signed them only because the detectives threatened her. The statements were then introduced as substantive evidence. Detective Jenkins testified that Taylor was not threatened or coerced while she was questioned by police. N.T. Trial, 11/26/12, at 153–269; N.T. Trial, 11/28/12, at 98–123.

On December 3, 2012, Appellant was convicted of second-degree murder, robbery, and conspiracy. He was acquitted of possessing an instrument of crime. That same day, the trial court sentenced Appellant to life in prison.

Appellant appealed to this Court. On June 8, 2015, we held that Appellant's robbery charge merged with his second-degree murder charge for purposes of sentencing. We affirmed Appellant's judgment of sentence in all other respects. On February 8, 2016, our Supreme Court denied Appellant's petition for allowance of appeal.

On September 16, 2016, Appellant filed a timely PCRA petition *pro se.* On July 17, 2018, Appellant filed an amended PCRA petition through counsel alleging that he was entitled to relief because he had newly discovered evidence that Detective Pitts had coerced Taylor into giving her second and third statements to the police. The newly discovered evidence was a finding by a Philadelphia judge in an unrelated case[1] in 2017, years after trial in the

---

[1] *Commonwealth v. Dwayne Thorpe*, CP-51-CR-0011433-2008.

present case, that Detective Pitts engaged in a pattern, practice and routine of coercing witness statements.[2]

On March 10, 2023, following two hearings, the PCRA court denied Appellant's amended petition. Appellant timely appealed to this Court, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in his appellate brief:

1. Whether the PCRA Court committed an error of law and/or abused its discretion by denying relief after finding the Jury's verdict was unreliable and refusing to order a new trial for [Appellant]?

2. Did the PCRA Court commit an error of law or an abuse of discretion by denying relief, after finding the jury verdict unreliable predicated upon Detective Pitts' misconduct, ADA Conroy's brutal hours-long *Brady-Lively* examination of witness Raffinee Taylor, and vacating the conviction of the second codefendant who had the same tainted Jury for the same joint trial?

3. Whether the PCRA Court erroneously concluded that after excising all references to Raffinee Taylor's statement to Detective Pitts from the record, the remaining evidence would have been (a) sufficient to allow the jury to find [Appellant] guilty of robbery and second degree murder and (b) unlikely to compel a different verdict at a new trial?

4. Did the PCRA Court commit an error of law or an abuse of discretion by denying relief, finding [Appellant] guilty of

_____

[2] In 2022, Detective Pitts was arrested and charged with perjury for his conduct in one such case. On July 16, 2024, the Philadelphia District Attorney's Office announced that a jury found Detective Pitts guilty of assaulting a murder suspect in order to coerce the suspect's confession and then testifying falsely that he did not assault the suspect. *See* https://phillyda.org/news/jury-convicts-former-police-detective-james-pitts-of-perjury-obstruction-for-role-in-wrongful-murder-conviction/ (last accessed 10/10/2024).

crimes/evidence his twelve person jury previously found him not guilty of, based on evidence that no court testimony, out of court statements, DNA, or fingerprint analysis ever linked him or any of his other codefendants to?

5. Did the PCRA Court commit an error of law or an abuse of discretion by denying relief, after PCRA Counsel failed to object or correct PCRA Prosecutor Frisby's patently false statement that trial testimony proved [Appellant] told various individuals, including Mrs. Hines, of his intentions to rob Decedent Ernie Miller, and for failing to properly brief the law?

6. Whether the PCRA Court applied the incorrect legal analysis/test for a claim of after discovered evidence, i.e., prejudice vs. different verdict?

Appellant's Brief at 8.

Our review of a PCRA court's decision

is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. With respect to the PCRA court's decision to deny a request for an evidentiary hearing, or to hold a limited evidentiary hearing, such a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

*Commonwealth v. Murchison*, 294 A.3d 1251, 1260-61 (Pa. Super. 2023) (*en banc*) (citation omitted).

To be entitled to PCRA relief, a petitioner must plead and prove by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S.A. § 9543(a)(2), which provides, in relevant part:

(2) That the conviction or sentence resulted from one or more of the following:

* * *

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

*Id.* To establish a claim under subsection (2)(vi), the petitioner must prove that (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. *Id.* at 1261. In determining whether the newly discovered evidence would likely compel a different verdict,

a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction. [C]ases that have addressed [after-discovered evidence] have focused not simply on the credibility of the person offering the exculpatory evidence, but on the credibility or trustworthiness of the evidence itself, as well as the motive, or other impeaching characteristics, of those offering it.

*Commonwealth v. Crumbley*, 270 A.3d 1171, 1179 (Pa. Super. 2022) (citations omitted).

Appellant contends that the evidence of Detective Pitts' misconduct which surfaced after Appellant's trial should result in a new trial in which Taylor's statements to Detective Pitts are excluded from evidence. Absent Taylor's statements, Appellant continues, the evidence against Appellant

would likely result in an acquittal. The Commonwealth concedes that it lacks confidence in Taylor's statements to Detective Pitts but argues that the outcome of trial would remain the same even without Taylor's statements. The PCRA court denied relief on the ground that the verdict would likely have remained the same due to other evidence against Appellant that was unrelated to Taylor's statements. We agree with the PCRA court that no relief is due.

This case is similar to another recent case in which a PCRA petitioner attempted without success to obtain relief on the basis of Detective Pitts' alleged misconduct during the interrogation of a Commonwealth witness. *See Commonwealth v. Pickens*, 2022 WL 600011 (Pa. Super. filed Mar. 1, 2022) (unpublished memorandum). In *Pickens*, the witness, Ra'Shonda Mack, gave a statement to Detective Pitts and another detective implicating the petitioner in a murder. *Id.* at *1. Detective Pitts did not testify at the petitioner's trial, and Mack recanted her statement during her trial testimony. *Id.* The jury convicted the petitioner of first-degree murder, and his conviction was affirmed on direct appeal. *Id.* The petitioner filed a PCRA petition seeking relief on the same ground that Appellant raises in the present case: the newly discovered evidence of Detective Pitts' coercive interrogation tactics that came to light in the *Thorpe* case. *Id.* Attached to the petition was Mack's signed statement averring that she gave her prior statement to the detectives due to threats that Detective Pitts made during her interview. *Id.*

The PCRA court dismissed the petition. We affirmed, reasoning, *inter alia*, that Mack's proposed testimony was unlikely to compel a different verdict because four other witnesses identified Appellant as the murderer. *Id.* at *3. Although the petitioner argued that the four witnesses were themselves unreliable, their alleged unreliability was explored during trial and did not prevent the jury from reaching a guilty verdict. *Id.* Furthermore, the jury saw Mack recant her statement to Detective Pitts on the witness stand yet still found the petitioner guilty. *Id.* at *4.

Here, as in *Pickens*, (1) a Commonwealth witness, Taylor, recanted two of her statements to Detective Pitts on the witness stand, claiming that she signed these statements because the detectives (including Detective Pitts) threatened her; and (2) Appellant sought PCRA relief based on the evidence of Detective Pitts' misconduct that emerged after Appellant's trial in the *Thorpe* case. Nevertheless, as in *Pickens*, there was substantial evidence against Appellant that would likely have resulted in a guilty verdict even if the coerced statements were precluded from evidence.

The PCRA court found considerable evidence implicating Appellant in the murder and robbery independent of Taylor's recanted statements to Detective Pitts. PCRA Court Opinion, 8/18/23, at 8-12. First, Appellant purposefully went to Miller's home on the night of the shooting with his friends Vincent Wallace and Michael Grant. *Id.* at 8. Michelle Hinds, the wife of deceased coconspirator Grant, testified that on the day of the murder, Grant left after

- 11 -

telling her he had to "make a run." N.T. Trial, 11/26/12, at 131. When Grant did not return, Hinds called Appellant seeking her husband. *Id.* at 116, 120–21. Appellant told her that he could not discuss the matter over the phone. When they met in person, Appellant told her that Grant "did not make it back from this one." *Id.* at 121. Appellant explained that "it was a shootout and [Grant] got shot." *Id.*

Appellant's statement to Hinds also verified that he was inside Miller's home during the shooting. Opinion at 8-9. Appellant admitted to Hinds that there was a shootout and that he attempted to drag Grant away from the home after Grant was shot inside. Appellant's attempts to move Grant were verified by the blood smear left on the sidewalk leading from inside the house. N.T. Trial, 11/26/12 at 58–59; N.T. Trial, 11/27/12 at 26. Furthermore, Appellant's statement to Hinds that the person who shot her husband was also dead implied that Appellant was present, not just on the street, but in the home where he had a clear view of Miller being shot and could know that Miller was also dead.

Eyewitness Duane Tate, who testified at the preliminary hearing that he saw codefendant Wallace limping away from the scene of the shooting, identified Appellant from a photo array and at the preliminary hearing as an individual who looked like the driver of a dark vehicle with front end damage that he saw that night. PCRA Court Opinion, 8/18/23, at 8; N.T. Trial, 11/28/12 at 180–82.

- 12 -

Although Taylor recanted two of her statements to Detective Pitts, she also gave testimony during the preliminary hearing and trial establishing that Appellant went to Miller's home intending to commit a crime. PCRA Court Opinion, 8/18/23, at 9. Since this testimony is independent of the recanted statements, the PCRA court correctly factored it into its analysis. Taylor testified at trial that she knew Miller, who had taken modeling photographs of her in the past. N.T. Trial, 11/26/12 at 155–56. A few weeks before the shooting, Taylor saw victim Miller at an audition at a North Philadelphia home that turned out to be where Miller now lived and operated his studio. *Id.* at 160–61. Taylor testified that she assumed Appellant had paid Miller money for her prior modeling photos, but she never saw Appellant make those payments. The Commonwealth, however, confronted Taylor with her preliminary hearing testimony that Appellant had paid Miller. *Id.* at 217–21. Since Taylor's preliminary hearing testimony was under oath, it was admissible as substantive evidence that Appellant made these payments. Pa.R.E. 803.1(1). Taylor further acknowledged that she testified during the preliminary hearing that she told Appellant she had seen Miller a few weeks before the shooting. *Id.* at 224–26. In response to learning of Miller's new location and continued business activities, Appellant said, "Wow, [Miller] moved from another location and he's still doing the same thing." *Id.* at 228–29. Taylor also corroborated Hinds's testimony by verifying that she had taken

Appellant to meet Hinds on the night of the shooting and that Appellant was upset that night. *Id.* at 174–76, 179–80.

After the shooting, police recovered a pair of handcuffs and a walkie-talkie from outside of the residence, as well as a sweatshirt stained with Grant's blood that had a bullet hole through the fabric. PCRA Court Opinion, 8/18/23, at 9; N.T. Trial, 11/27/12 at 9, 36–38. The PCRA court found that there was no reason to believe that the handcuffs and walkie-talkie, which were outside, belonged to Miller, who was retreating up his stairs and further into the home during the shooting. These items were brought by Appellant or his coconspirators to Miller's home for criminal purposes.

Next, Appellant informed Hinds that Grant "didn't make it back from this one." N.T. Trial, 11/26/12 at 121; PCRA Court Opinion, 8/18/23, at 8. Combined with Appellant's comment that Grant did not come back from "mak[ing] a run" with Appellant, his statement to Hinds plainly implies that the "run" was the home invasion and confrontation with Miller. This interpretation is further bolstered by Hinds's testimony that Appellant told her, in an apparent attempt to ease her grief over the loss of her husband, that the person who shot her husband was dead.

The PCRA court reasoned that this evidence, viewed collectively, established that Appellant had paid Miller several hundred dollars for Taylor's modeling photos, that Appellant was newly aware of where Miller lived and operated his business, and that Appellant was displeased that Miller was still

accepting money from aspiring models. The fact that Appellant, only weeks after learning of Miller's new address, was present at Miller's home, in the company of two other individuals, at least one of whom was armed with a gun, was ample circumstantial evidence that he arrived at Miller's home with criminal intent. PCRA Court Opinion, 8/18/23, at 10.

In addition, the evidence established that two weapons were fired and that Miller was retreating into his home at the time of the shooting. *Id.* at 10-11. Ballistics evidence was recovered throughout the first floor of the home. N.T. Trial, 11/27/12 at 10–11, 16–30. Police found multiple fired cartridge cases from two separate firearms, although no firearm was recovered. *Id.*; N.T. Trial, 11/28/12 at 46–53. The medical examiner testified that Miller was ultimately struck and paralyzed by a bullet, which would have immediately rendered him unable to stand. N.T. Trial, 11/27/12 at 126–27. The ballistics evidence establishes that Miller, after meeting his assailants at the door, was retreating up his stairs, firing at Appellant and his coconspirators, who remained in the vestibule area. *Id.* at 20, 47. Given the location of Miller and the perpetrators at the time of the shooting, the PCRA court thought it clear that Miller did not welcome Appellant and his coconspirators into his home and felt threatened by their presence at his door. PCRA Court Opinion, 8/18/23, at 11.

Police arrived on the scene within minutes of the shooting. N.T. Trial, 11/26/12 at 83. Despite this quick response, no firearms were recovered. *Id.*

at 87. The only reasonable inference from the lack of firearms is that Appellant or codefendant Wallace took those weapons when they fled the scene. The disposal of these weapons, said the PCRA court, was additional evidence of guilt and established a separate basis for Appellant's robbery conviction because Miller's firearm was taken through force. PCRA Court Opinion, 8/18/23, at 11.

The PCRA court also determined that the evidence established Appellant's flight from the home was not merely because he wanted to save his friend. Police recovered video surveillance footage from the time when codefendant Wallace was dropped off at the hospital. N.T. Trial, 11/27/12 at 141, 154–55. This footage showed a dark sedan with front end damage drive up near the hospital, but not to the emergency room doors. *Id.* at 154–57. Instead, codefendant Wallace could be seen exiting the vehicle and limping towards the hospital doors while the vehicle he was in—which was last seen being driven away from the shooting by Appellant—left the hospital. *Id.* at 157–58. Since no firearms were recovered at the crime scene, the evidence demonstrates that Appellant took the firearms used in the crime and abandoned Wallace near the hospital, disposed of the weapons and disappeared from the scene. *Id.*

Appellant's conduct after the shooting also demonstrated his consciousness of guilt. *Id.* at 12. He fled from the hospital after dropping off Wallace and was not arrested until nearly four months later. N.T. Trial,

11/28/12 at 82. Police made repeated efforts to locate and arrest Appellant, finally finding him months after the shooting at an apartment ten miles from Appellant's known residence. *Id.* at 71–78, 82–83. When officers entered the property, Appellant attempted to flee through the window to avoid apprehension. *Id.* In the room where Appellant was arrested, police found mail addressed to his known residence, a key that would open the handcuffs found at the scene of the shooting, and a ballistics vest. *Id.* at 83–84.

For these reasons, the PCRA court correctly concluded that the evidence, independent of Taylor's statements to Detective Pitts, established that Appellant committed the robbery and murder, and that there is no reasonable likelihood that Appellant would have been acquitted if Taylor's statements were excluded from evidence.

Appellant further contends that the PCRA court applied the wrong standard to the evidence. Although Appellant admits that the court recited the proper standard of review—*i.e.*, the evidence would likely result in a different verdict if a new trial were granted—Appellant insists that the court analyzed the evidence under the standard used for gauging the sufficiency of the evidence in direct appeals. Under the sufficiency standard, the court addresses whether the evidence, viewed in the light most favorable to the verdict winner, satisfies every element of the crime beyond a reasonable doubt. *Commonwealth v. Gause*, 164 A.3d 532, 540-41 (Pa. Super. 2017) (*en banc*). In support of this argument, Appellant directs our attention to

various comments in the PCRA court opinion that the jury could "reasonably infer" a certain fact or that it was "reasonable to conclude" a certain fact. Appellant's Brief at 17 (citing, *inter alia*, PCRA Court Opinion, 8/18/23, at 8 ("The jury may reasonably infer that Mr. Grant 'not make(ing) it back from this one' implied that Mr. Grant went to Miller's home with Appellant for a purpose")); **id.** at 18 (citing, *inter alia*, PCRA Court Opinion, 8/18/23, at 9 ("[I]t is far more reasonable to conclude that [the walkie-talkie and handcuffs] were brought by Appellant or his co-defendants to the victim's home for criminal purposes").

We conclude that the PCRA court applied the proper standard to this case. Statements such as the jury could "reasonably infer" a certain fact or that it was "reasonable to conclude" a certain fact fit within **Crumbley's** directive that the PCRA court assess the "overall strength" of the evidence supporting the conviction, as well as "the credibility or trustworthiness" of the evidence, when examining whether newly discovered evidence would likely compel a different verdict in a new trial. **Crumbley**, 270 A.3d at 1179. Read in context, the PCRA court's comments were made during its thorough discussion that the "overall strength" of the evidence against Appellant precluded Appellant's request for a new trial. **Id.**

Finally, Appellant argues that the PCRA court erred by considering evidence that walkie-talkies, handcuffs and handcuff keys were found outside of the victim's home, because the jury acquitted Appellant of possession of an

instrument of crime. It is well settled that issues not raised in a Rule 1925 statement of matters complained of on appeal are waived. **Commonwealth v. Hill**, 16 A.3d 484, 494 (Pa. 2011). Appellate courts may raise such waivers *sua sponte*. **Id.** Appellant filed two Rule 1925 statements, but neither raise this issue. Thus, this issue is waived. We acknowledge that Rule 1925 provides, "Each error identified in the [Rule 1925] statement will be deemed to include every subsidiary issue **that was raised in the trial court**." Pa.R.A.P. 1925(b)(4)(v) (emphasis added). Conceivably, this issue is subsidiary to an issue actually raised in Appellant's first Rule 1925 statement that the evidence would have been unlikely to compel a guilty verdict after excising Taylor's statements to Detective Pitts from evidence. The record demonstrates, however, that this issue was not "raised in the [PCRA] court" in Appellant's original petition, amended petition, or during either hearing on the amended petition. Thus, we cannot review the merits of this issue.

For these reasons, we conclude that the PCRA court properly denied relief to Appellant.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date:  12/17/2024